# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | NO. 05-614-02 |
| | : | |
| **PHILIP CHARTOCK** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                                                               June 17, 2013

A jury found Philip Chartock guilty of various offenses arising from his role in paying former Philadelphia City Councilman Richard Mariano more than $23,000 in bribes. Mr. Chartock filed a petition for relief under 28 U.S.C. § 2255 in which he claimed that "the Supreme Court ruled that honest services fraud should be limited to bribery only in <u>Skilling v. United States</u>. This new landmark case helps me with vacating my case." <u>See</u> Document #285. When Mr. Chartock was no longer in custody, I denied his petition as moot. Mr. Chartock filed a counseled petition for writ of *error coram nobis* pursuant to 28 U.S.C. § 1651.[1] For the reasons that follow, I will deny the petition in part and grant it in part.

---

[1] Mr. Chartock's petition is deficient. Local Rule 7.1(c) provides that every motion shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion. Further, Local Rule 7.1(a) requires that every motion be accompanied by a proposed Order for the court's consideration. Mr. Chartock's petition includes neither a brief nor a proposed Order. His disorganized petition, consisting of just over two pages, provides nothing more than twenty-one numbered "paragraphs" of allegations only some of which refer to error.

## I. BACKGROUND

On October 25, 2005, a grand jury in the Eastern District of Pennsylvania returned an indictment charging Defendant Philip Chartock, among others, with conspiracy to commit honest services fraud in violation of 18 U.S.C. § 371 in Count One; aiding and abetting honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 in Counts Two through Eight; aiding and abetting honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 in Count Fourteen; and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(I) in Counts Eighteen and Nineteen. These charges arose out of secret payments of more than $23,000 made by Mr. Chartock and his co-defendant father, Louis Chartock, to Philadelphia City Councilman and co-defendant Richard Mariano. These payments were made in exchange for Mr. Mariano's assistance to the Chartocks' business, Erie Steel, Ltd., including Mr. Mariano's vote on legislation making Erie Steel eligible for tax breaks and Mr. Mariano's intervention with pollution inspectors who had found that Erie Steel was in violation of city regulations.

Mr. Chartock moved pretrial to dismiss the indictment contending that the honest services fraud charges were unconstitutionally vague and that the money laundering charges did not involve proceeds of unlawful activity. I denied that motion, finding that the indictment properly pled both the bribery and failure to disclose a conflict-of-interest theories of honest services fraud, and that these theories were not unconstitutionally vague. I further found that the indictment properly pled money laundering based on the

deposit of bribe money into straw parties' bank accounts and then causing the straw parties to obtain or write checks to the companies that issued credit cards to Mr. Mariano.

During pretrial proceedings, I severed Mr. Mariano's case from the case against the Chartocks to avoid issues under <u>Bruton v. United States</u>, 391 U.S.123 (1968), based on statements made by the Chartocks to law enforcement agents. Mr. Mariano proceeded to trial first. On March 17, 2006, following a two-week trial, the jury found Mr. Mariano guilty of conspiracy to commit honest services fraud and numerous other charges. On July 6, 2006, Mr. Mariano was sentenced to seventy-eight months' imprisonment.

On April 24, 2007, the Chartock trial began. The evidence at trial showed that Mr. Chartock and his co-defendant father sought to obtain tax breaks for their company, as well as other favorable treatment from various agencies of the City of Philadelphia from at least 2002 to 2005. The Chartocks paid more than $23,000 in bribes, and Mr. Mariano accepted the money with the understanding that it was meant to influence his official actions.

On May 8, 2007, the jury found Mr. Chartock guilty of conspiracy to commit honest services fraud (Count One), aiding and abetting honest services mail fraud (Counts Two, Three, Four, Five, and Six), aiding and abetting honest services wire fraud (Count Fourteen), and money laundering (Counts Eighteen and Nineteen). The jury found him not guilty on Count Eight, and the government moved to dismiss Count Seven. I note that counsel for Mr. Chartock had requested that the jury answer interrogatories regarding the underlying theories of honest services fraud. In response to those

interrogatories, the jury found that Mr. Chartock was guilty under both the bribery and failure to disclose theories on Counts Two, Three, Four, and Fourteen, and only on the failure to disclose theory as to Counts Five and Six. See Document #144.

Mr. Chartock filed a post-trial motion challenging the sufficiency of the evidence supporting the honest services fraud and money laundering convictions. He also challenged the jury instruction that allowed the jury to find that overt acts occurred "on or about" the dates charged in the indictment. I denied the motion finding that "[t]here was more than sufficient evidence for the jury to find that Mr. Chartock deliberately participated in a scheme with Mr. Mariano to deprive the City's citizens of Mr. Mariano's honest services," and that "[t]he jury had more than sufficient evidence to conclude that these financial transactions involved the proceeds of unlawful activity, i.e., bribes; that Mr. Chartock and Mr. Mariano knew the nature of these transactions; and that the transactions were structured to conceal and disguise the nature, source, ownership, and control of the bribe payments." See Document #223 at 8, 16.

Mr. Chartock was sentenced to forty months' imprisonment, a term of supervised release of two years, a fine of $25,000, and a special assessment of $900. In determining the sentence, I first approved the offense level calculation set forth in the presentence report. Specifically, the total offense level for Mr. Chartock was 24.[2]

---

[2] The offense level was set by the portions of U.S.S.G. § 2C1.1 applicable to bribery offenses. The base offense level for the honest services fraud offenses was 12 under U.S.S.G. § 2C1.1(a)(2); there was a 2-level increase because the offense involved more than one bribe under U.S.S.G. § 2C1.1(b)(1); there was a 4-level increase for the value of the payments made to Mr.

Based on a 1989 conviction for DUI and a 2000 conviction for forging a prescription for 120 Percocet tablets, Mr. Chartock's criminal history category was set at III.  The guideline range for that category combined with the total offense level was calculated to be sixty-three to seventy-eight months' imprisonment.  At sentencing, I granted a downward departure in the criminal history category to category I because the original category over-represented the defendant's actual criminal history.  This reduced the advisory sentencing range to fifty-one to sixty-three months.  I also granted a downward variance, explaining in the judgment and commitment Order:

> Philip Chartock has no significant criminal history; his driving under the influence conviction was fifteen (15) years ago. The Court finds that he is at very low risk to re-offend and he poses no threat to society. Further, Philip Chartock was heavily influenced by Councilman Mariano in making the bribe payments and by his father, Louis Chartock, in covering up his conduct.  The defendant showed true, credible remorse. He will likely suffer the loss of his business and his means of earning a living as a result of this conviction. For this defendant, the guideline range is unnecessarily high and is beyond what is needed for a reasonable sentence.

See Document #235.  Mr. Chartock filed a timely appeal, raising four issues: (1) the sufficiency of the evidence of honest services fraud; (2) the accuracy of the jury instruction regarding bribery; (3) the sufficiency of the evidence of money laundering; and (4) the propriety of the instruction that the jury only had to find that overt acts were

---

Mariano under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(C); there was a 4-level increase because the offense involved an elected public official under U.S.S.G. § 2C1.1(b)(3); and there was a 2-level increase for the money laundering offenses under U.S.S.G. § 2S1.1(a)(1), (b)(2)(B).

committed on or about the dates charged in the indictment. The Third Circuit denied these arguments and affirmed the conviction and sentence. United States v. Chartock, 283 Fed. Appx. 948 (3d Cir. June 30, 2008).

## II. LEGAL STANDARD

The writ of *error coram nobis* is an ancient common-law remedy designed "to correct errors of fact." United States v. Denedo, 556 U.S. 904, 910-911 (2009) (citing United States v. Morgan, 346 U.S. 502, 507 (1954)). It is an extraordinary remedy used to attack federal convictions with continuing consequences when a petitioner is no longer "in custody" for purposes of 28 U.S.C. § 2255. United States v. Rhines, 640 F.3d 69, 71 (3d Cir. 2011). A federal court's jurisdiction to issue a writ of *error coram nobis* derives from 28 U.S.C. § 1651, which authorizes federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); Morgan, 346 U.S. at 502. *Coram nobis* relief is only available in the court that issued the criminal judgment. Obado v. New Jersey, 328 F.3d 716, 718 (3d Cir. 2003). A court's jurisdiction to grant such relief is of limited scope, and the standard for obtaining it is more stringent than that applicable on direct appeal or in *habeas corpus*. See United States v. Stoneman, 870 F.2d 102, 106 (3d Cir. 1989). Errors which could be remedied by a new trial do not usually come within the writ. Id. Rather, the error must be fundamental and "go to the jurisdiction of the trial court, thus rendering the trial itself invalid." Id. "Any rationale confining the writ to technical errors, however, has been superseded; for in its modern iteration *coram nobis* is

broader than its common-law predecessor." Id. Accordingly, a writ of *coram nobis* can issue to redress a fundamental error as opposed to mere technical errors. Morgan, 346 U.S. at 513. As an example, where a person is convicted for conduct which is not a crime, that error is fundamental, and may warrant *coram nobis* relief. See Stoneman, 870 F.2d at 105. The availability of the writ is limited to "extraordinary" cases presenting circumstances compelling its use "to achieve justice." Morgan, 346 U.S. at 511. Another limit, of course, is that an extraordinary remedy may not issue when alternative remedies, such as *habeas corpus*, are available. Id. As explained by the United States Court of Appeals for the Seventh Circuit, *coram nobis* arose as a device to extend the period in which the judge who rendered a decision could reexamine it. Lowery v. McCaughtry, 954 F.2d 422, 423 (7th Cir. 1992). Thus, the "usages and principles of law" send an applicant seeking *coram nobis* to the court that issued the judgment. Id.; see also Sinclair v. Louisiana, 679 F.2d 513, 514 (5th Cir. 1982) (noting that a "writ of *error coram nobis* can only issue to aid the jurisdiction of the court in which the conviction was had.") "Any proceeding which is challenged by the writ is presumed to be correct and the burden rests on its assailant to show otherwise . . . Relief will be granted only when circumstances compel such action 'to achieve justice.'" United States v. Cariola, 323 F.2d 180, 184 (3d Cir. 1963) (quoting Morgan, 346 U.S. at 512).

### III. DISCUSSION

Mr. Chartock brings several claims in his petition for relief, only some of which are appropriate here. For example, Mr. Chartock challenges the sufficiency of the

7

evidence to convict him, some of the court's instructions to the jury, the inconsistency of Miss Margaret Greer's testimony, and the reliability of her testimony given her having been charged with embezzling money from Erie Steel. Mr. Chartock also argues that nothing in the record permitted a reasonable jury to conclude that he intended to exchange any official action for a thing of value. These claims cannot be considered fundamental errors because they do not "go to the jurisdiction of the trial court, thus rendering the trial itself invalid." See Stoneman, 870 F.2d at 106. Thus, they are inappropriate in a petition for *error coram nobis*, and will not be considered here.

The remaining claims, however, are appropriate in a petition for *error coram nobis*. Id. First, Mr. Chartock claims that that his conviction should be vacated because the jury convicted him of conduct that is no longer criminal in light of the Supreme Court's decision in Skilling v. United States, 130 S. Ct. 2896 (2010). He argues that his conviction was based upon the government's improper application of honest services fraud in light of that decision which limited the scope of the honest services statute to acts involving bribery or kickbacks. Second, Mr. Chartock claims that there was prejudicial spillover from improper jury instructions and the prosecutor's comments concerning the honest services fraud counts which tainted the remaining convictions. Mr. Chartock provides no specifics or analysis for his claims in his petition.

### A. **Skilling v. United States**

Previously, in the Third Circuit as elsewhere, the courts had approved what may be termed a "conflict-of-interest" theory of honest services fraud, where an official

violates a duty of disclosure and takes official action benefitting that undisclosed interest. See United States v. Panarella, 277 F.3d 678, 695 (3d Cir. 2002) ("a public official's nondisclosure of a financial interest while taking discretionary action that the official knows will directly benefit that interest falls squarely within the classical definition of fraud.") On June 24, 2010, however, the Supreme Court of the United States addressed claims that the honest services fraud statute was unconstitutionally vague, and that it did not include theories of liability advanced by the government. Id. The Court determined that the statute is valid, but as drafted proscribes only schemes involving bribery or kickbacks, and does not prohibit conflict-of-interest fraud.[3] Id. Because Skilling decriminalizes conduct that previously had been held to constitute honest services fraud, it applies retroactively to final criminal convictions. Bousley v. United States, 523 U.S. 614, 620-621 (1998) (Supreme Court decisions "holding that a substantive federal criminal statute does not reach certain conduct" apply retroactively on collateral review).

At trial, Mr. Chartock's counsel requested that the jury answer special interrogatories regarding the underlying theories of honest services fraud. The jury found that Philip Chartock was guilty under both the bribery theory and the failure to disclose a conflict-of-interest theory on Counts Two, Three, Four, and Fourteen, but only on the

---

[3] The Court stated: "Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague." 130 S. Ct. at 2933.

9

failure to disclose theory on Counts Five and Six.[4] See Document #144. On March 1, 2007, I denied Mr. Chartock's post-trial motion, finding that:

> "[t]here was more than sufficient evidence for the jury to find that Chartock deliberately participated in a scheme with Mariano to deprive the City's citizens of Mariano's honest services," and that "[t]he jury had more than sufficient evidence to conclude that these financial transactions involved the proceeds of unlawful activity, i.e., bribes; that Chartock and Mariano knew the nature of these transactions; and that the transactions were structured to conceal and disguise the nature, source, ownership, and control of the bribe payments."

See Document #223 at 8, 16. The Court's decision in Skilling has no effect on those findings. Contrary to his contention, Mr. Chartock was convicted for conduct which is still a criminal offense, i.e., honest services fraud through bribery.

Where a case is presented to the jury on multiple theories of guilt, and one of those theories is subsequently invalidated on legal grounds, the defendant may be entitled to a new trial, unless it may be ascertained that the jury relied on a theory which retains validity. See Neder v. United States, 527 U.S. 1, 19 (1999) (where a general verdict is returned on multiple theories, and one is later invalidated, the error may still be harmless if the evidence on the valid theory was so strong that no rational jury could have failed to convict on that basis). In 1987, the Supreme Court entirely invalidated the honest

---

[4] Counts Two, Three, Four, and Fourteen involved the actual payments by Mr. Chartock to Mr. Mariano, and the cover-up of the first bribe by creating a fictitious receipt for loan repayment. The jury found that these were bribes. On the other hand, Counts Five and Six concerned efforts that Mr. Mariano undertook on the Chartocks' behalf. The jury viewed these charges as not implicating the bribery theory but only nondisclosure fraud.

services theory of mail and wire fraud.[5] McNally v. United States, 483 U.S. 350 (1987). Following that decision, the Third Circuit Court of Appeals repeatedly denied collateral relief where the circumstances demonstrated that the petitioner, who was convicted of the invalidated theory, was also guilty on the valid theory of mail and wire fraud barring schemes to obtain money or property. See United States v. Martinez, 905 F.2d 709, 715-716 (3d Cir. 1990) (reversing *coram nobis* relief where the evidence established that the defendant was guilty not only under the invalid theory but also under the then-valid theory that the fraud targeted a license which was tangible property in the hands of the state); Stoneman, 870 F.2d at 104 (denying *coram nobis* relief where "the loss of money was implicit in the intangible rights scheme," and "the majority is unable to hypothesize a set of circumstances under which the jury could have found Stoneman guilty of depriving the citizens of the Commonwealth of Pennsylvania of their right to honest government (an impermissible intangible right under McNally) without also having found" a scheme to defraud the state of money); United States v. Osser, 864 F.2d 1056 (3d Cir. 1988) (denying *coram nobis* relief where an indictment, which presented an intangible rights theory invalidated in McNally, also set forth that the scheme resulted in a monetary loss to a city); United States v. Asher, 854 F.2d 1483, 1494-95 (3d Cir. 1988) (affirming mail fraud conviction where the court was "unable to hypothesize a set of circumstances under

---

[5] I note that, after McNally, Congress enacted Section 1346, providing that the fraud statutes applied to the intangible right to honest services. That set in motion a new generation of honest services prosecutions, and the events which ultimately led to the Supreme Court's Skilling decision interpreting Section 1346.

11

which this jury could have found Asher guilty of depriving the citizens of the Commonwealth of their right to honest government . . . without also having found that Asher was involved in a scheme" to deprive the Commonwealth of money).

The outcome of the case before me is similar to those in our circuit following McNally, but for one dispositive difference. Here, there was no "general verdict" on multiple theories. Instead, the jury's verdict was unambiguous: it explicitly held that Mr. Chartock engaged in bribery in violation of the honest services statute in four of the counts. The following review of the evidence easily ascertains that, for four of the counts, the jury relied on the theory which retains validity, i.e., bribery.

The essence of bribery is a *quid pro quo*, an exchange of this for that. United States v. Antico, 275 F.3d 245, 262 (3d Cir. 2001). A *quid pro quo* exists where "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Evans v. United States, 504 U.S. 255, 268 (1992). The *quid pro quo* can be implicit. A conviction can occur if the prosecution shows that the defendant accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity. Antico, 275 F.3d at 257.

The jury heard overwhelming evidence that proved that Mr. Chartock had paid three bribes to Mr. Mariano during 2002. Instead of taking cash or some other form of payment, Mr. Mariano received checks made payable to his credit card companies to pay off his personal debts. The first bribe occurred on May 10, 2002. See United States v.

12

Philip Chartock, 283 Fed. Appx. 948, 950 (3d Cir. 2008). Mr. Chartock gave Mr. Mariano an Erie Steel check for $5,873.75 made payable to Fleet Credit Card Services. This check was classified in Erie Steel's records as a sales expense. Id.

Four days before this payment, officials of the Air Management Services Division of the City's Department of Public Health sought to inspect Erie Steel's plant to determine whether it was in compliance with the City's air pollution standards. Instead of consenting to the inspection, Mr. Chartock sought Mr. Mariano's assistance and intervention. Id. Mr. Mariano immediately called Department of Public Health officials to intervene on behalf of Erie Steel. After Public Health officials determined that Erie Steel was, in fact, in violation of several air pollution regulations, Mr. Chartock used Mr. Mariano's influence to postpone corrective actions that would have been necessary to bring Erie Steel into compliance. Id.

The second bribe payment occurred on August 26, 2002. Id. This time, Mr. Chartock chose not to give Mr. Mariano an Erie Steel check because his company's outside accountants had questioned the propriety of the May 10, 2002 check. Id. In an attempt to avoid further scrutiny, Mr. Chartock wrote a check to third party William Burns and classified it as a repair and maintenance expense. Co-defendant Rosalia Mattioni deposited the Erie Steel check into an account her company jointly owned with

Mr. Burns.[6] She then laundered the bribe payment by obtaining a bank check in the amount of $6,672 made payable to AT&T Universal Card for payment of another of Mr. Mariano's personal credit card bills. Id. Shortly after Mr. Pellecchia and Miss Mattioni helped to launder this second bribe, Mr. Mariano arranged for Mr. Pellecchia to meet with School District officials to discuss a potential consulting contract between the School District and Danlin Management Group.

At the time of the second bribe, Mr. Chartock had been actively seeking Mr. Mariano's assistance in obtaining tax relief for his business. Id. at 951. On November 13, 2002, Mr. Mariano met with Mr. Chartock and a City official to discuss tax breaks for Erie Steel. Even though the City official explained that Erie Steel did not meet the criteria for the tax relief, Mr. Chartock and his father continued to seek Mr. Mariano's assistance. On November 25, 2002, Louis Chartock asked Mr. Mariano to introduce legislation making Erie Steel eligible for tax relief.

On December 6, 2002, Philip Chartock made a third bribe payment to Mr. Mariano by writing an Erie Steel check to third party Recon International, a company owned by co-defendant Vincent DiPentino. Id. Mr. Chartock classified this check as a "freight, equipment, and rental expense." Mr. DiPentino laundered the money by writing a check for $10,900, made payable to Capital One for payment of Mr. Mariano's personal credit card bill. Over the next couple of years, Mr. Mariano assisted Mr. DiPentino by

---

[6] Miss Mattioni and her co-defendant husband Joseph Pellecchia own and operate Danlin Management Group.

supporting the sale of city-owned properties to Recon, and by assisting him in his efforts to obtain certifications, licenses, and compromises of certain tax, water, and sewer penalties for Mr. DiPentino's businesses.

Mr. Mariano introduced legislation to make Erie Steel eligible for the tax relief that the Chartocks had sought. He recommended to the City that Erie Steel be included in the tax relief legislation known as the Keystone Opportunity Zone ("KOZ") program. Id. The City accepted that recommendation and included Erie Steel in a proposed tax relief bill introduced in City Council in April 2003. During the following month, Mr. Mariano voted in favor of that legislation on two occasions. Id.

After the tax relief legislation was passed, the Chartocks sought additional favors from Mr. Mariano with energy rate reductions from PECO, resolution of outstanding tax issues, removal of a judgment against Erie Steel, and rate reductions from the Pennsylvania Workers' Compensation Rating Bureau. Id.

Maggie Greer, a former Erie Steel bookkeeper, blew the whistle on the bribes that had been paid to Mr. Mariano by sending an anonymous letter to the City Council President and the Mayor. Id. Mr. Mariano learned of the letter and with the help of the Chartocks, devised a scheme to cover up the bribes by claiming that they were loans which had been paid off. Id. at 952. In fact, on May 20, 2004, Philip Chartock faxed a letter dated May 3, 2004 to his father in Florida stating that Mr. Mariano had paid the May 10, 2002 loan in full over time. On May 26, 2004, his father faxed a letter to the Philadelphia District Attorney's Office stating that his son had lent $5,874 to Mariano

15

and that Mariano had repaid the money in full. As support, the father faxed a copy of the letter sent to him by Philip Chartock.

On March 30, 2005, FBI agents interviewed Mr. Chartock who claimed that the check to Fleet Credit Card Services was a loan to Mr. Mariano; that there were no loan documents; and that the loan had been repaid by Mr. Mariano. Id. When shown the other two checks, Mr. Chartock admitted that he had signed the checks but claimed that he knew nothing about them. Mr. Chartock also admitted that Mr. Mariano had helped him with various issues for his business. Id.

After the FBI's investigation became public, Mr. Chartock met with Thomas Rapak, Erie Steel's outside accountant, who inquired about Erie Steel's payments to Mr. Mariano. Mr. Chartock told Mr. Rapak that there were no loan documents and that Mr. Mariano had made no repayments. After the indictment was filed, the Chartocks asked Mr. Rapak to prepare an amended 2002 tax return for Erie Steel. They requested that Mr. Rapak change the $23,000 in payments to Mr. Mariano from a deductible business expense to a non-deductible loan from Erie Steel to Mr. Chartock.

This evidence showed the jury that Mr. Chartock falsely classified checks he gave to Mr. Mariano as business expenses; he received false and fraudulent invoices in an attempt to cover up these payments; he created a false receipt showing that Mr. Mariano had repaid some of the money that had been "loaned" to him; and he lied to the FBI about his relationship with Mr. Mariano, falsely claiming that he knew nothing about the second and third checks given to pay Mr. Mariano's personal credit card bills. It was

more than sufficient for the jury to find that Mr. Chartock deliberately participated in a scheme with Mr. Mariano to deprive the City's citizens of Mr. Mariano's honest services under the bribery theory alone.

### B. Prejudicial Spillover[7]

At the time I instructed the jury that it could convict for honest services fraud under either a "conflict-of-interest" theory, a "bribery" theory, or under both theories, this instruction properly stated the law for this circuit. See Panarella, 277 F.3d at 690. Although Skilling rendered that instruction improper, the error did not affect Mr. Chartock's substantial rights, and thus does not require reversal of the four counts based on the bribery theory.

When two charges are closely linked and one of the charges is vacated, a court must ensure that the error on the vacated charge did not affect the remaining charge. If there has been such prejudicial spillover, the court should order a new trial on the remaining valid charge. United States v. Wright, et al., 665 F.3d 560, 575 (3d Cir. 2011) (citing United States v. Murphy, 323 F.3d 102, 122 (3d Cir. 2003)).

Courts apply a two-step test for prejudicial spillover. First, it must be determined "whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count[s]." Wright, 665 F.3d at 575 (citing United States v. Cross,

---

[7] In his reply to the government's response, Mr. Chartock complains that the government ignored his prejudicial spillover claim. He "respectfully requests" that this issue "be reserved for further briefing rather than unduly wasting judicial resources in Petitioner's response." Mr. Chartock has it backwards. It was *his* duty to brief this issue properly and thoroughly in his petition at the outset, not to wait and challenge the government's response.

308 F.3d 308, 317 (3d Cir. 2002)). If all evidence on the discarded counts would remain admissible at a trial on the remaining valid counts, then the inquiry ends and resentencing on the valid counts should occur.

If some evidence would be inadmissible, then the court must proceed to the second step to determine whether the spillover evidence was prejudicial. Id. To make that determination, four factors are weighed in a light somewhat favorable to the defendant: "whether (1) the charges are intertwined with each other; (2) the evidence for the remaining counts is sufficiently distinct to support the verdict on these counts; (3) the elimination of the invalid count significantly changed the strategy of the trial; and (4) the prosecution used language of the sort to arouse a jury." Wright, 665 F.3d at 575 (quoting Murphy, 323 F.3d at 118). If the otherwise inadmissible evidence was prejudicial, a new trial on the "tainted" counts should ensue.

Applying this two-step inquiry, I find that there was no spillover evidence from the failure to disclose theory counts to the bribery theory counts. As reviewed above, none of the evidence at trial would have been inadmissible at a hypothetical trial on the bribery theory counts alone. The counts which the jury convicted based solely on failure to disclose, i.e., Counts Five and Six, concerned efforts that Mr. Mariano undertook on the Chartocks' behalf. Evidence to support Count Five included a letter from Mr. Chartock sent by United States mail to the City of Philadelphia Department of Public Health Air Management Services Division, with a carbon copy to Mr. Mariano, in which Mr. Chartock stated that he would submit a request for exemption from the City of

18

Philadelphia operating permit requirement. Evidence supporting Count Six consisted of a letter from Mr. Chartock sent by United States mail to PECO, with a carbon copy to Mr. Mariano, seeking a rate reduction for Erie Steel because of its inclusion in the KOZ. The jury viewed these charges as not implicating the bribery theory but only the failure to disclose theory of honest services fraud. None of this evidence would have been inadmissible at a trial on the four bribery theory counts. Accordingly, proceeding to the second step of this inquiry is unnecessary, and a retrial on the four bribery theory counts is unwarranted.

### C. Continuing Consequences

Finally, I note that in keeping with the extraordinary nature of the writ, a person seeking *coram nobis* relief must show not only exceptional error, but also that there are continuing legal consequences of the conviction. Osser, 864 F.2d at 1059-1060 (a petitioner seeking *coram nobis* relief must demonstrate that "sound reasons" exist for failing to seek relief earlier, that he continues to suffer collateral consequences from his conviction, even though he is out of custody, and that an error of "the most fundamental character" has occurred); see also Morgan, 346 U.S. at 512-513 (*coram nobis* relief is not available if a sentence has been executed unless the conviction carries continuing penalties). In his barebones petition, Mr. Chartock presents no such consequences.

### D. Conclusion

Mr. Chartock asks for his conviction to be vacated. The Supreme Court decision upon which he relies, however, provides him no real relief because it invalidated only one

of the two theories of honest services fraud under which he was found guilty. After reviewing overwhelming evidence, the jury convicted Mr. Chartock for conduct which is still a criminal offense, i.e., honest services fraud based on the valid theory of bribery. The jury answered, upon defense counsel's request, specific interrogatories and found that the evidence established that Mr. Chartock was guilty not only under the invalid theory but also under the valid theory. Any error at trial which may have resulted by the Court's decision was harmless error because, irrespective of that error, Mr. Chartock still would have been convicted of honest services fraud on the valid bribery theory. There was no prejudicial spillover evidence from the invalid theory to the valid theory, and a retrial is unwarranted.

Nevertheless, I will vacate Mr. Chartock's convictions on Counts Five and Six because the jury based its finding of guilt solely on the now-invalid conflict-of-interest theory of honest services fraud. This dismissal has no effect on sentencing because I imposed a below-guideline sentence of forty months' imprisonment and two years' supervised release to run *concurrently* on all counts. Accordingly, elimination of Counts Five and Six have no impact on Mr. Chartock's sentence.

An appropriate Order follows.